UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Roxanne L., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 18 CV 50059 |
| | ) Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, who is now 53 years old, has been trying since 2010 to obtain disability benefits. Her medical problems began in 2006 when she strained her back at work. Although she received a worker's compensation settlement, she continued working for several more years. But in 2010, she claimed the pain was too much to keep working. She then applied for Title II benefits. In 2012, an ALJ denied her claim. The next month, plaintiff filed another application, which was again denied by an ALJ in 2014. The next month, she filed the third and present application. She contends she cannot work because of back pain and body-wide pain caused by fibromyalgia.[2] At the administrative hearing, plaintiff testified that her pain left her bedridden 3 to 4 days a week. The ALJ found this and other statements not credible. Plaintiff argues that this credibility finding was flawed for multiple reasons.

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.
[2] She also alleged that she suffered from depression, but she has not challenged the ALJ's finding that this was not a severe impairment, and this Court thus will not summarize those allegations. Nor has plaintiff raised any arguments concerning her obesity.

1

# BACKGROUND

The parties agree that, for purposes of this appeal, the relevant medical record begins in August 2014 and that it mostly concerns plaintiff's treatment with one doctor. In August 2014, plaintiff went to her primary physician, Dr. Rose Stocker, complaining of worsening pain.[3] Dr. Stocker referred plaintiff to Dr. Eric Freeman, a pain management specialist. Over the next 22 months, plaintiff saw Dr. Freeman 12 times, at roughly two-month intervals. The notes from these 12 visits are the primary piece of evidence in the case. *See* Exs. 2F, 5F, 7F.

The first visit was on September 10, 2014. Dr. Freeman wrote that plaintiff came to the clinic "with regard to her primarily back pain but also more diffuse pain" that had been gradually increasing since the work accident in 2006. R. 378. Plaintiff told Dr. Freeman that she had tried various medications over the years. After examining plaintiff, Dr. Freeman wrote that the "widespread body pain" was "likely due to diffuse myofascial pain consistent with fibromyalgia." R. 379. As for treatment recommendations, Dr. Freeman stated that plaintiff should try Lyrica and Zipsor to start with. If these didn't work, she could try others, such as gabapentin, Lidoderm patches, or compounded creams. R. 380. Dr. Freeman did not recommend any injections because plaintiff's pain was "fairly diffuse" and no "specific abnormalities" were yet seen on scans. R. 380. Dr. Freeman also included a section called "Other therapies" in which he stated the following:

> I discussed with Ms. [L.] that I recommend she maintain as much activity as possible. She states there are days when she does not get out of bed and I explained to her that inactivity often worsens chronic myofascial pain. In the near future, we would likely consider reinstituting physical therapy or possibly myofascial therapy. A TENS unit could be considered.

---

[3] This was a few months before the second administrative hearing.

*Id.* Over the next 11 visits, Dr. Freeman occasionally adjusted plaintiff's medications, but other than these changes, no other treatment was tried by plaintiff, and plaintiff's condition remained about the same.

On September 14, 2016, the administrative hearing was held. Plaintiff's counsel gave the following opening statement:

> Ms. [L] suffers from widespread pain due to fibromyalgia, she has bilateral hip trochanteric bursitis, she has chronic back pain, she suffers from depression as well. Given her significant pain, there are days she's not able to get out of bed, she has difficulty standing or walking without the use of a cane, and does so for only short periods of time. It's our position she wouldn't be capable of maintaining any employment, but as of her 50th birthday, she can easily be found disabled under the grid rules based on a sedentary limitation.

R. 33-34. Plaintiff then testified about her history and medical treatment. She was married and had been married for 27 years; her husband was employed as a warranty technician; she graduated from high school, although she was in some special education classes; she could drive a car, but rarely did so. The ALJ observed that plaintiff had a cane with her. Plaintiff stated that Dr. Stocker prescribed the cane years ago. The ALJ then asked about plaintiff's employment history. Plaintiff had worked from 1998 to 2006 in manufacturing, and then did packaging assembly on and off from 2006 to 2010. R. 39. She was a supervisor for some of the time. Plaintiff injured her back in 2006 when she went to pick up some parts in a bin, and subsequently received a worker's compensation settlement of $21,760. R. 41. As will be discussed below, the ALJ asked a series of questions about treatment recommendations her doctors made.

On March 1, 2017, the ALJ found that plaintiff had the following severe impairments at Step Two: "obesity; fibromyalgia; and degenerative disc disease of the thoracic and lumbar spine." R. 20. The ALJ then found that plaintiff did not meet a listing and that she had the residual functional capacity ("RFC") to do light work. The key portion of the decision was the

ALJ's finding that plaintiff's allegations about her pain were not credible based on "objective medical evidence and other evidence." R. 22-23. As for the opinion evidence, the ALJ gave great weight to the opinions of two state agency physicians who opined plaintiff could do light work. Significantly, the ALJ noted that plaintiff had not supplied any contrary medical opinion.

## DISCUSSION

In her opening brief, plaintiff did not challenge the ALJ's analysis of the medical opinions, but instead focused her entire argument for remand solely on the credibility finding. As the Seventh Circuit has stated, this Court should not overturn a credibility finding unless it was "patently wrong." *Sawyer v. Colvin*, 512 Fed. Appx. 603, 607 (7th Cir. 2013). The Seventh Circuit has further stated that not "all" of the ALJ's credibility rationales need to be found valid to affirm, as long as "*enough* of them are." *Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009) (emphasis in original). In short, this Court must give the ALJ "substantial deference" in this area. *Cf. Ray v. Berryhill*, 915 F.3d 486, 490 (7th Cir. 2019) ("With respect to the adverse credibility determination, this is the rare case in which the claimant can overcome the 'considerable deference' we afford such findings unless they are 'patently wrong'").[4]

Plaintiff's begins her argument by trying to create a clear target to shoot at. This is a reasonable starting point because the ALJ's discussion is somewhat loosely-structured and does not segment the credibility rationales into neat little bundles, nor designate how much weight each one should be given. This leaves some room for interpretation. In plaintiff's view, the ALJ "largely" relied on just three rationales. Dkt. #9 at 3. Having confined the playing field to these

---

[4] As the Government notes, SSR 16-3p applies to this case, and this regulation "abandons use of the term 'credibility.'" Dkt. #14 at 9. But as the Government also notes, the Seventh Circuit has acknowledged that, despite this change, ALJs "obviously" will "continue to asses credibility of pain *assertions* by applicants." *Cole .v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original). Here, neither side has argued that any of the Seventh Circuit's case law is no longer applicable. And the Court has chosen, for the sake of convenience, to continue using catchall phrases such like "credibility finding" or "credibility analysis." The Court notes that the Seventh Circuit in the recent *Ray* decision quoted above used the broad label "credibility determination."

three rationales, plaintiff then attacks them one by one. However, the Court does not agree that these are only three rationales. There are at least two more, as this Court will discuss. But the Court begins with plaintiff's arguments.

**Stable and Controlled Pain.** The first credibility rationale, again according to plaintiff's interpretation, is that "plaintiff's pain was stable and controlled on medicine." Dkt. #9 at 3. This assertion contains two parts, stability and control. As for the stability claim, the ALJ concluded that plaintiff "consistently" told Dr. Freeman that her pain was "at a 3 to 4" on a 10-point scale. However, the ALJ acknowledged two exceptions to this finding. The first was the December 22, 2014 visit in which plaintiff initially rated her pain at 6, but later during the same visit downgraded it to a 3. (The visit also plays a role in the "presentation" rationale below.) The second was the July 18, 2016 visit, which was the last visit, where plaintiff rated her pain at a 7, but stated that she was then "running out of her medications." R. 24. The ALJ reasoned that this second pain spike was caused by medication non-compliance, an issue also discussed below. Even if plaintiff was not at fault for these pain spikes, the ALJ still had substantial evidence for the stability finding based on the consistent reports from the remaining visits. Dr. Freeman wrote the following after plaintiff's last visit with him: "Ms. [L.] will follow-up with us on an as needed basis. At this point, she has been stable on her medications *for some time* and thus future refills will come from her primary care physician." R. 433 (emphasis added). Dr. Freeman also wrote that it was *plaintiff* who characterized her pain as stable. R. 432.

As for the controlled part, plaintiff asserts that her "pain is not described anywhere in the record as being controlled." Dkt. #9 at 4. But this claim is easily contradicted. Dr. Freeman noted that plaintiff described her pain as being controlled. *See, e.g.*, R. 433 ("Ms. [L] reports that her pain at this point is controlled."). In fact, elsewhere in plaintiff's own brief, she acknowledges

5

this fact, thus contradicting her own argument. *See* Dkt. #9 at 5 ("In July 2015, plaintiff reported diffuse pain but stated her pain was under fairly good control.").

In sum, substantial evidence supports the conclusion that plaintiff's pain was stable and controlled. But an important point, one that gets lost in plaintiff's criticism, is that the ALJ did not reach this conclusion in a vacuum. The ALJ used it as a comparison point. The ALJ noted that the stability finding (*i.e.* that the pain was consistently at the 3-to-4 level) was at odds with plaintiff's hearing testimony, where she stated that her pain was "so intense that 3 to 4 days of the week she does not even leave her bed except to go to the bathroom." R. 23. In other words, the key point was the discrepancy. Plaintiff never addressed this part of the ALJ's analysis.

**Medication Compliance.** The second rationale on plaintiff's list is the finding that plaintiff "did not take her medicines as prescribed." Dkt. #9 at 3. Plaintiff makes the following sub-arguments: (1) she stopped taking Lyrica, but the ALJ failed to fully acknowledge that this was because it was supposedly causing her to have "dark thoughts"; (2) plaintiff did not take a compounded cream, but the ALJ did not fully consider that this medication was costly; and (3) plaintiff "neglected to call for refills" in July 2016, but the ALJ overlooked that that was a "single event" and that plaintiff otherwise "readily took any medicines offered." Dkt. #9 at 6-7. Although some counter-arguments perhaps could be raised in response to parts of these assertions, the Court on the whole finds that plaintiff has raised a valid complaint. If medication non-compliance were the sole rationale, the Court would remand the case. But the Court does not find the ALJ's errors are so substantial that they contaminate the multiple other valid rationales.

**Consistent Presentation.** The final rationale from plaintiff's list is the claim that "plaintiff's presentation was inconsistent." Dkt. #9 at 3. This was not a statement the ALJ made in such clear terms, although it is arguably captures an underlying theme in the decision.

Plaintiff uses this broader label mainly to refer to two separate topics. The Court will address them individually.

The first is the claim that plaintiff made "variable" pain reports. As discussed above, the ALJ stated that plaintiff, at the December 22, 2014 visit, first reported her pain at a 6 but then downgraded it to a 3. Relying on this one example, and possibly the second example of the visit in July 2016 in which plaintiff reported a pain level of 7 after she had run out of medications, the ALJ stated as follows: "The claimant's pain complaints have varied considerably, not just from examination to examination, but even in mid-examination." R. 23.

The Court agrees that this sentence is questionable. As plaintiff rightly notes, it is not uncommon for patients to report that their pain varied. Perhaps it is a little more unusual to vary during a single visit, but the ALJ offered no authority to suggest that this by itself is significant. And even if one were to accept the premise that varying pain reports are suspicious on some level, in this case, there are only two such examples. But the biggest problem with the ALJ's variable pain rationale is that it is at odds with the stability rationale. Although the Court finds that the former rationale is not supported by substantial evidence, the Court does not find that it played a major role in the decision.

The second "presentation" issue concerns plaintiff's claim that she could not walk without a cane. The ALJ doubted this claim on the following grounds:

> As for the claimant's alleged ambulation difficulties, again her presentations vary considerably throughout the record. Although the claimant alleges the need for a cane and presented at her psychological consultative evaluation with a cane in February 3, 2015. [sic] However, there is no objective medical evidence that a cane is medically necessary. Indeed, at all of her visits to the Rockford Pain Center, Dr. Freeman consistently has reported that she has a non-antalgic gait without any report of using a cane. Similarly, the claimant's primary care physician, Rose Stocker, D.O., reports that claimant's gait and station are normal, without any mention of cane use.

7

R. 24 (citations omitted). In her opening brief, plaintiff offered the following two-point rebuttal:

> While it is true that the records are quite vague as to when plaintiff was using her cane, the records also do not state that she was *not* using a cane. The records state that her gait was non-antalgic, however, an antalgic gait could simply mean that plaintiff was not limping. *See* https://en.wikipedia.org/wiki/Antalgic_gait[.]

Dkt. #9 at 8 (emphasis in original).

This rebuttal is not persuasive. The first argument concedes the factual premise—namely, that *no* medical records from treating physicians indicated that plaintiff either needed a cane or was seen using one. Plaintiff tries to flip the burden and argue that the ALJ was required to prove a negative. But plaintiff has provided no support for this approach. Under the facts of this case, the Court finds that it was reasonable for the ALJ to have drawn a negative inference. When asked at the hearing how far she could walk, plaintiff stated that she had to use a cane to even just walk to her mailbox, which she estimated was only a "four to six feet" walk. R. 55. If she needed the cane for such short distances, it is reasonable to assume that she would have needed a cane to walk from the waiting room to the examination room and even to walk the distance needed to perform the gait test. In short, the ALJ reasonably could have concluded that, if plaintiff indeed needed a cane to the degree she claimed, surely one of her doctors would have seen her using it or would have discussed the issue with her and then noted in their records. *See Joe R. v. Berryhill*, 363 F.Supp.3d 876, 884 (N.D. Ill. 2019) ("Wouldn't [the claimant] have mentioned something, just once, in several visits over the years about not be[ing] able to stand or walk? Common sense and human experience—which have a role to play in all cases, including Social Security cases—dictates that he would have.") (internal citations omitted).

Plaintiff's second argument brings up the larger topic of objective evidence. Plaintiff only addresses one particular finding—that her gait was non-antalgic. Relying on the Wikipedia article, she is only able to *suggest* that it was *possible* for someone to still need a cane even

8

though they had a non-antalgic gait. This is a very modest, hard-to-prove-or-disprove claim. It is also rests on armchair doctor playing. The Court does not find that it undermines the ALJ's reliance on the broader finding that the totality of the objective evidence did not lend support to the plaintiff's alleged need to use a cane to walk.

To sum up, although the Court agrees that the ALJ's credibility discussion contains a few questionable findings, the Court does not agree with all of plaintiff's criticisms and finds that substantial parts of the three rationales plaintiff has focused on are valid. But the bigger problem with plaintiff's overall argument is that she glossed over several other rationales.

**Lack of Objective Evidence.** As previewed above, the ALJ clearly relied on the lack of objective evidence as one of the credibility rationales. In fact, an argument could be made that it was the most important one. It was mentioned first. The ALJ also repeatedly used the phrase "objective evidence" when announcing her overall finding. And she specifically relied on this rationale in the cane discussion.

In her opening brief, plaintiff acknowledged that she was excluding this rationale from her argument. Specifically, in a footnote inserted at the end of the sentence where she stated that the ALJ "largely" relied on just three rationales, she noted that the ALJ, in fact, also relied on the lack of objective evidence as one rationale. Dkt. #9 at 3 n.2. Then, in a sleight-of-hand maneuver, she declared that this rationale did not need to be addressed because the ALJ only discussed it in two sentences.

Plaintiff's attempt to banish this rationale to a short footnote was neither fair nor a good rhetorical strategy. The issue of whether the objective evidence supports the claimant's allegations is an important factor in almost every case where pain is a key part of the case. Here, the ALJ clearly relied on this rationale, as plaintiff's footnote recognizes. As for the explanation

only being two sentences long, this overlooks the fact that the ALJ also mentioned the lack of objective evidence in several other places in the decision, thus suggesting that it was not trivial. Moreover, the two sentences in this case are deceiving because the ALJ included numerous record citations. These were available for inspection by plaintiff. Significantly, plaintiff has not disputed the validity of these citations, nor offered any counter-citations to suggest the ALJ was cherrypicking.

In sum, the Court finds that the ALJ in fact did rely on the "lack of objective evidence" as one of the rationales, that there was substantial evidence for doing so, and that this rationale could be relied on as long as it was not the sole rationale, which it was not. *See Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) ("Although an ALJ may not ignore a claimant's subjective reports of pain simply because they are not supported by the medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration.").

**Unwillingness To Try Physical Therapy.** Another rationale overlooked by plaintiff was the ALJ's statement that plaintiff had "not gone for physical therapy, as her pain doctor had suggested." R. 24. This rationale relates to the larger issue of treatment compliance. In plaintiff's brief, she acknowledged that the ALJ relied on this rationale, but she did not further respond to it. We are left without the benefit of plaintiff's possible counter-arguments. To be sure, the ALJ only included one sentence explicitly on this issue, and the ALJ also did not discuss the specific evidence supporting this rationale. So it might be reasonable to conclude that this was not one of the ALJ's "key" rationales. But even "minor" rationales can be considered in the overall mix. As the Court previously noted, the Seventh Circuit in *Halsell* recognized that some credibility rationales are stronger than others.

Although the ALJ did not discuss the specific evidence supporting this rationale, this does not mean that it did not exist. In fact, it is strong, in this Court's view. Dr. Freeman's notes document that he repeatedly recommended that plaintiff try physical therapy and that plaintiff repeatedly refused the offer. For example, at the May 18, 2015 visit, Dr. Freeman told plaintiff that physical therapy, along with myofascial therapy, would be "very helpful" for her but recorded that she "would prefer to avoid" these options.[5] R. 445. There is no obvious explanation in the record indicating why plaintiff chose not to follow these recommendations. At the hearing, the ALJ asked about this issue in the following exchange:

> Q  Have [any of your doctors] offered you any additional treatment, like an epidural or physical therapy or a TENS unit?
>
> A  No, Dr. Freeman, the last visit before he left, he told me if I wanted to get into another pain management I could.
>
> Q  So, from what you're telling me, it doesn't seem like pain management is doing much to help you?
>
> A  It does a little, not much.
>
> Q  Okay. But they're not talking about physical therapy or anything like that?
>
> A  I'm sorry, I didn't hear you.
>
> Q  They're not offering you or discussing physical therapy?
>
> A  No.

R. 49. Plaintiff's repeated and clear denial that her doctors ever "offered" or even "discussed" physical therapy is strongly at odds with Dr. Freeman's treatment notes. This raises a question of

---

[5] *See also* R. 443 (July 16, 2015: "Myofascial therapy could be considered or even physical therapy for her trochanteric bursitis but at this point *she prefers not to* initiate those.") (emphasis added); R. 435 (April 22, 2016: "Myofascial therapy could be considered but given *her predisposition for inactivity*, a more active therapy modality may be more appropriate.") (emphasis added); R. 453 (October 27, 2014: "Retrialing physical therapy or myofascial therapy could be considered."); R. 380 (same).

11

whether plaintiff gave truthful testimony on this point. Perhaps there is an explanation, although it is not obvious what it would be. In any event, the bottom line is that the ALJ was justified in relying on plaintiff's failure to try physical therapy as part of the credibility finding.

Additionally, it should be noted, Dr. Freeman also recommended, in addition to physical therapy, that plaintiff exercise, be active, and try to get out of bed more.[6] Presumably, the doctor would not have advocated that she be more active if he believed she was not physically capable of doing so. Yet, despite the doctor's repeated requests, plaintiff chose not to comply with them. Although the Court recognizes that the ALJ did not specifically refer to plaintiff's failure to follow these additional treatment recommendations, they would have further strengthened the non-compliance rationale. *See Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010) (affirming the ALJ's credibility finding where the ALJ the claimant "either refused or utterly failed to adhere to treatment programs prescribed by her physicians," which included going to physical therapy and exercising).

## CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is denied, the Government's motion is granted, and the ALJ's decision is affirmed.

Date: May 20, 2019     By: _____
                          Iain D. Johnston
                          United States Magistrate Judge

---

[6] *See, e.g.,* R. 447 (March 30, 2015: "I again encouraged Ms. [L.] to be as active as possible and to minimize those days in which she does not get out of bed."); R. 441 (November 2, 2015: "I have encouraged Ms. [L.] to be as active as possible including either yoga or water exercises."); R. 437 (Feb. 9, 2016: "I have encouraged Ms. [L.] again today to be as active as possible and that spending much of the day in bed is likely to worsen her whole body pain."). In addition, other medical personnel made similar recommendations. *See, e.g.* R. 462 (Sarah Gumey: "Discussed physical therapy/pool therapy for chronic low back pain. She declines at this time.").